# Exhibit 1

FEDERAL DEPOSIT INSURANCE CORPORATION

WASHINGTON, D.C.

CERTIFICATION

 I, Jennifer M. Jones, Deputy Executive Secretary, Federal Deposit Insurance Corporation, hereby certify and attest that the annexed document is a true and correct copy of an official record of the Federal Deposit Insurance Corporation, said official record being contained in the case files relating to "In the Matter of John C. Ponte, an institution-affiliated party of Independence Bank, East Greenwich, Rhode Island," Docket Nos. FDIC-22-0109e and FDIC-22-0143b:

 A document entitled "Notice of Intention to Remove from Office and Prohibit from Further Participation, Notice of Charges for an Order for Restitution, Notice of Assessment of Civil Money Penalties, Findings of Fact and Conclusions of Law, Orders to Pay, Notice of Hearing, and Prayers for Relief," issued under delegated authority by Patricia A. Colohan, Associate Director, Federal Deposit Insurance Corporation, dated February 10, 2023.

 I have subscribed my name and caused the seal of the Corporation to be affixed hereon, this 23rd day of January, 2026.



**089068**

JENNIFER
JONES

Digitally signed by JENNIFER
JONES
Date: 2026.01.23 13:57:27
-05'00'

Jennifer M. Jones
Deputy Executive Secretary

EXHIBIT 1 PAGE 1

FEDERAL DEPOSIT INSURANCE CORPORATION

WASHINGTON, D.C.

| | |
|---|---|
| ) | NOTICE OF INTENTION TO REMOVE |
| In the Matter of ) | FROM OFFICE AND PROHIBIT FROM |
| ) | FURTHER PARTICIPATION, NOTICE OF |
| **Robert S. Catanzaro**, ) | CHARGES FOR AN ORDER FOR |
| **Danielle M. Desrosiers**, and ) | RESTITUTION, NOTICE OF |
| **John C. Ponte**, as institution-affiliated ) | ASSESSMENT OF CIVIL MONEY |
| parties of ) | PENALTIES, FINDINGS OF FACT AND |
| ) | CONCLUSIONS OF LAW, |
| Independence Bank ) | ORDERS TO PAY, NOTICE OF |
| East Greenwich, Rhode Island ) | HEARING, and PRAYERS FOR RELIEF |
| ) | |
| (Insured State Nonmember Bank) ) | FDIC-22-0112e, FDIC-22-0113k |
| ) | FDIC-22-0107e, FDIC-22-0108k |
| Respondent Catanzaro's NMLS UI#: N/A ) | FDIC-22-0143b, **FDIC-22-0109e**, FDIC-22- |
| Respondent Desrosiers's NMLS UI#: ) | 0110k |
| 1529127 ) | |
| Respondent Ponte's NMLS UI#: N/A ) | |
| ) | |

The FDIC determined that Robert S. Catanzaro (Respondent Catanzaro) was the Chief

Executive Officer (CEO), a Director, and Principal Shareholder at Independence Bank, East

Greenwich, Rhode Island (Bank), and an institution-affiliated party (IAP) of the Bank.

Respondent Catanzaro, directly or indirectly, violated regulations, recklessly engaged in unsafe

or unsound practices in connection with the Bank, and breached fiduciary duties owed to the

Bank from June 2017 through 2019 (Relevant Times).  Respondent Catanzaro's violations,

practices, and breaches were part of a pattern of misconduct, caused the Bank to suffer more than

a minimal loss or other damage, and caused Respondent Catanzaro to receive financial gain or

other benefit.   Respondent Catanzaro's violations, practices, and breaches involved personal

dishonesty and demonstrated Respondent Catanzaro's willful or continuing disregard for the

safety or soundness of the Bank.

EXHIBIT 1 PAGE 2

The FDIC determined that Danielle M. Desrosiers (Respondent Desrosiers) was an Executive Vice President of the Bank and IAP of the Bank. Respondent Desrosiers, directly or indirectly, violated regulations, recklessly engaged in unsafe or unsound practices in connection with the Bank, and breached fiduciary duties owed to the Bank from June 2017 through January 31, 2018. Respondent Desrosiers's violations, practices, and breaches were part of a pattern of misconduct, caused the Bank to suffer more than a minimal loss or other damage, or caused Respondent Desrosiers to receive financial gain or other benefit. Respondent Desrosiers's violations, practices and breaches involved personal dishonesty or demonstrated Respondent Desrosiers's willful or continuing disregard for the safety or soundness of the Bank.

The FDIC determined that John C. Ponte (Respondent Ponte) was an institution-affiliated party of the Bank. Respondent Ponte, directly or indirectly, violated regulations and recklessly engaged in unsafe or unsound practices in connection with the Bank during the Relevant Times. Respondent Ponte's violations and practices were part of a pattern of misconduct, caused the Bank to suffer more than a minimal loss or other damage, and caused Respondent Ponte to receive financial gain or other benefit. Respondent Ponte's violations and practices involved personal dishonesty or demonstrated Respondent Ponte's willful or continuing disregard for the safety or soundness of the Bank. The FDIC further determined that Respondent Ponte was unjustly enriched in connection with such violations and practices, and that the violations and practices involved a reckless disregard for any applicable regulations.

### NOTICE OF INTENTION TO REMOVE FROM OFFICE AND PROHIBIT FROM FURTHER PARTICIPATION

The FDIC issues this Notice of Intention to Remove from Office and Prohibit From Further Participation and Findings of Fact and Conclusions of Law (collectively, Notice of

2

EXHIBIT 1 PAGE 3

Charges) under 12 U.S.C. § 1818(e) and the FDIC Rules of Practice and Procedure, 12 C.F.R. part 308, subparts A and B. This proceeding will determine whether an order should be issued against Respondent Catanzaro under 12 U.S.C. § 1818(e), to remove Respondent Catanzaro as an IAP of the Bank and prohibit Respondent Catanzaro from further participation in the conduct of the affairs of the Bank, and any other insured depository institution or organization listed in 12 U.S.C. §1818(e)(7)(A) without the prior written approval of the FDIC and any other appropriate Federal financial institutions regulatory agency. This proceeding will also determine whether orders should be issued against Respondent Ponte and Respondent Desrosiers under 12 U.S.C. § 1818(e) to prohibit Respondent Ponte and Respondent Desrosiers from further participation in the conduct of the affairs of the Bank and any other insured depository institution or organization listed in 12 U.S.C. §1818(e)(7)(A) without the prior written approval of the FDIC and any other appropriate Federal financial institutions regulatory agency.

## NOTICE OF CHARGES FOR AN ORDER FOR RESTITUTION

The FDIC further issues this Notice of Charges for an Order for Restitution, Findings of Fact and Conclusions of Law, and Order for Restitution (collectively, Notice of Restitution) under 12 U.S.C. § 1818(b) and the FDIC Rules of Practice and Procedure, 12 C.F.R. part 308 subparts A and B. This proceeding will determine whether an Order for Restitution in an amount no less than $326,000 should be issued against Respondent Ponte under 12 U.S.C. § 1818(b).

## NOTICE OF ASSESSMENT OF CIVIL MONEY PENALTIES

The FDIC further issues this Notice of Assessment of Civil Money Penalties, Findings of Fact and Conclusions of Law, and Orders to Pay (collectively, Notice of Assessment) under 12 U.S.C. § 1818(i)(2) and the FDIC Rules of Practice and Procedure, 12 C.F.R. part 308,

EXHIBIT 1 PAGE 4

subparts A and B.  This proceeding assesses a $400,000 civil money penalty against Respondent Catanzaro, a $128,000 civil money penalty against Respondent Desrosiers, and a $74,000 civil money penalty against Respondent Ponte under 12 U.S.C. § 1818(i)(2), unless the Respondents formally object by timely requesting a hearing under 12 U.S.C. § 1818(i)(2)(H).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The FDIC makes the following allegations against the Respondents:

### I.    Jurisdiction

1.    At all Relevant Times, the Bank was a corporation existing and doing business under the laws of the State of Rhode Island with its principal place of business in East Greenwich, Rhode Island.

2.    At all Relevant Times, the Bank was an insured State nonmember bank subject to 12 U.S.C. §§ 1811-1831aa, 12 C.F.R. chapter III, and the laws of the State of Rhode Island.

3.    At all Relevant Times, the Bank's sole business strategy was the origination of U.S. Small Business Administration (SBA) Small Loan Advantage (SLA) 7a loans in amounts up to $150,000, 85% guaranteed by the SBA (SBA Loans).

4.    SBA SLA 7a loans is an SBA program for providing financial assistance to small businesses.  Loans up to $150,000 are 85% guaranteed by the SBA.  The Bank was granted delegated authority to make eligibility determinations on these loans without SBA review.

4

EXHIBIT 1 PAGE 5

*Respondent Catanzaro*

5.       At all Relevant Times, Respondent Catanzaro was the CEO, a Director, and the controlling shareholder of the Bank, and he continues to serve in those capacities.

6.       At all Relevant Times, Respondent Catanzaro was an IAP of the Bank under 12 U.S.C. § 1813(u) and for purposes of 12 U.S.C. § 1818(e)(7), 1818(i), and 1818(j).

*Respondent Desrosiers*

7.       From approximately 2010 until her resignation on January 31, 2018, Respondent Desrosiers was employed as an Executive Vice President at the Bank and continued to serve in that capacity until her resignation.

8.       While employed by the Bank, Respondent Desrosiers was an IAP of the Bank under 12 U.S.C. § 1813(u) and for purposes of 12 U.S.C. § 1818(e)(7), 1818(i), and 1818(j).

*Respondent Ponte*

9.       At all Relevant Times, Respondent Ponte was the sole owner, managing member, and President of Ponte Investments, LLC, a Rhode Island limited liability company.

10.      Ponte Investments, LLC also operated under the names SBA Loan Program and SBALoanProgram.com and is now known as Greenwich Business Capital, LLC (collectively, Ponte Investments).

11.      At all Relevant Times, acting alone or in concert with others, Respondent Ponte formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Ponte Investments.

12.      At all Relevant Times, Respondent Ponte was a loan-referral agent. Respondent Ponte and Ponte Investments referred small businesses to the Bank for SBA SLA 7a loans.

5

EXHIBIT 1 PAGE 6

13.     Respondent Ponte, as the owner of Ponte Investments, executed a contract with the Bank in April 2015 (Loan Referral Agreement).

14.     From April 2015 through November 2018, the Loan Referral Agreement was revised four times.

15.     At all Relevant Times, Respondent Ponte participated in the conduct of the affairs of the Bank and played a role in directing the conduct of the Bank's affairs.

16.     On the average, during the Relevant Times, approximately 76% of the dollar amount of SBA Loans approved and funded by the Bank was from such loans referred by Respondent Ponte.

17.     At all Relevant Times, Respondent Ponte was in a position to materially influence the activities of the Bank.

18.     At all Relevant Times, Respondent Ponte had the ability to cause harm to the Bank.

19.     At all Relevant Times, Respondent Ponte performed banking practices for the Bank, including through referring loans to the Bank.

20.     Respondent Ponte used his position of influence at the Bank to cause significant harm to the Bank.

21.     At all Relevant Times, Respondent Ponte performed a banking practice for the Bank.

22.     At all Relevant Times, Respondent Ponte played a role in directing the conduct of the Bank's affairs.

EXHIBIT 1 PAGE 7

23.     At all Relevant Times, Respondent Ponte knowingly or recklessly participated in violations of regulations, which participation caused or was likely to cause more than a minimal financial loss to, or a significant adverse effect on, the Bank.

24.     At all Relevant Times, Respondent Ponte knowingly or recklessly participated in unsafe or unsound practices, which participation caused or was likely to cause more than a minimal financial loss to, or a significant adverse effect on, the Bank.

25.     At all Relevant Times, Respondent Ponte was an IAP of the Bank as that term is defined in 12 U.S.C. § 1813(u) and for purposes of 12 U.S.C. § 1818(b), 1818(e)(7), 1818(i), and 1818(j).

26.     The FDIC has jurisdiction over the Bank, the Respondents, and the subject matter of this proceeding.

**II.    Respondents' Misconduct**

*The Bank's Inadequate Risk Management*

27.     At all Relevant Times, Respondent Catanzaro maintained control over substantially all Bank operations and was a dominant officer.

28.     Respondent Catanzaro caused the Bank to enter into a high-risk non-diversified SBA lending strategy.

29.     At all Relevant Times, Respondent Ponte and Ponte Investments referred the vast majority of SBA Loans that the Bank closed and funded and, therefore, Respondent Ponte and Ponte Investments were responsible for most of the Bank's profitability.

30.     Respondent Catanzaro failed to ensure that the SBA Loan lending program had an adequate risk management framework and practices to identify and mitigate the risks associated with the Bank's business model.

7

EXHIBIT 1 PAGE 8

31.     Respondent Catanzaro's deficient risk management practices included inadequate oversight over Respondent Ponte, through Ponte Investments.

32.     Respondent Catanzaro's deficient risk management practices included inadequate oversight over Bank personnel working on loans referred by Respondent Ponte and Ponte Investments.

33.     Respondent Catanzaro was repeatedly notified by the FDIC of deficiencies in the Bank's SBA Loan program.

34.     The FDIC took multiple and increasingly severe regulatory actions against the Bank as a result of Respondent Catanzaro's failure to address deficiencies in the Bank's SBA program.

35.     Upon information and belief, Respondent Catanzaro purposefully failed to supervise Respondent Ponte and Ponte Investments because Respondent Ponte was a driver of the Bank's profitability.

*The Bridge Loans Scheme*

36.     The referral business of Respondent Ponte, through Ponte Investments, included finding prospective small-business borrowers and referring them to the Bank for SBA Loans.

37.     Respondent Ponte directed employees of Ponte Investments to offer extensions of credit (Bridge Loans) to all SBA Loan applicants while their SBA Loans were awaiting approval and funding by the Bank.

38.     At all Relevant Times, Bridge Loans were primarily offered and funded by Hydrangea Capital, LLC (Hydrangea Capital), a Delaware limited liability company that was 100% owned by Respondent Ponte.

39.     Bridge Loans were also offered and funded by Ponte Investments.

8

EXHIBIT 1 PAGE 9

40.    Per annum rates on the Bridge Loans were generally high—often 50% to 100%.

41.    Bridge Loans are risky extensions of credit and have an unusually high risk of default.

42.    Respondent Ponte arranged, where possible, to have the Bridge Loans repaid from the proceeds of the SBA Loans made by the Bank.

43.    Respondent Ponte concealed, or caused to be concealed, information regarding the Bridge Loans and, where applicable, their repayment from SBA Loan proceeds (the Bridge Loan Scheme).

44.    The Bridge Loan Scheme, including concealing material information from the Bank's underwriters and the SBA, was both an unsafe or unsound practice and a violation of 13 C.F.R. § 120.140.

45.    Through the Bridge Loan Scheme, Respondent Ponte targeted struggling small businesses by purporting to offer financial relief.  Typically, only businesses in weak financial condition agreed to take on Bridge Loans offered by Respondent Ponte and Ponte Investments. Nevertheless, Bridge Loans were highly lucrative for Respondent Ponte and Ponte Investments because, for loans approved by the SBA, Respondent Ponte shifted the risk of the Bridge Loans to the Bank and the SBA by having Bridge Loans repaid from SBA loan proceeds.

46.    Respondent Catanzaro and Respondent Desrosiers participated in the Bridge Loan Scheme.

47.    Respondent Catanzaro was aware of the Bridge Loan Scheme and worked with Mr. Ponte to ensure that Bridge Loans were not documented in the Bank's records.

48.    Respondent Catanzaro knowingly made false certifications on SBA forms to conceal the Bridge Loan Scheme from the SBA.

9

EXHIBIT 1 PAGE 10

49.    Respondent Desrosiers knew that SBA Loan applications to the Bank failed to document Bridge Loans but permitted applications with inaccurate information to be submitted anyway.

50.    Respondent Desrosiers did not alert Bank underwriters or the Bank's Board to the missing information in the Bank's files.

51.    As a result of all of the Respondents causing or participating in the Bridge Loan Scheme, material information was concealed from the regulators, including the FDIC and the SBA.

52.    During the Relevant Times, the Bank closed 201 SBA Loans that had been referred by Respondent Ponte, through Ponte Investments, and that contained undisclosed Bridge Loans.

53.    The Bank sold the guaranteed portion of the 201 SBA Loans in the secondary marketplace at a significant profit and kept the 15% unguaranteed portion on its balance sheet.

54.    Upon information and belief, borrowers with Bridge loans were generally not able to generate as much revenue from their SBA Loans—since SBA Loan proceeds were used to pay back the Bridge Loans—as comparable borrowers without Bridge Loans.  Consequently, borrowers with Bridge Loans were less able to pay back their SBA Loans to the Bank compared with other borrowers—who could use the full amount of SBA Loan proceeds and were therefore less likely to default.

55.    Approximately 44% of the 201 SBA Loans (or 89 SBA Loans) defaulted, leading to the Bank charging-off approximately $1.6 million.   The SBA found this default rate to be five times higher than the Bank's peer institutions.

EXHIBIT 1 PAGE 11

56.     The SBA sustained an estimated loss of $8.8 million on the guaranteed portion of the SBA Loans referred by Ponte Investments that had concealed Bridge Loans.

57.     During the Relevant Times, the Bank closed 1,505 SBA Loans that were referred by Ponte Investments and that did not have Bridge Loans.

58.     SBA Loans referred by Ponte Investments that did not have Bridge Loans had an approximately 15% charge-off rate.

59.     The riskier nature of SBA Loans with undisclosed Bridge Loans is evidenced by contrasting their default rate (44%) to SBA Loans referred by Ponte Investments without Bridge Loans (15%).

60.     When Bridge Loans were repaid using SBA Loan proceeds, the default risk of the Bridge Loan was transferred to the SBA and the Bank.

61.     Respondents caused or participated in the fraudulent transfer of the Bridge Loan default risk to the SBA and the Bank.

*The Bridge Loans themselves, the repayment of Bridge Loans using SBA loan proceeds, and the concealment of the Bridge Loans were violations of the SBA's regulations.*

62.     Bridge Loans to SBA applicants referred to the Bank by Ponte Investments were a violation of the SBA's regulation at 13 C.F.R. § 120.140.

63.     The repayment of Bridge Loans with proceeds of SBA Loans was a violation of the SBA's regulation at 13 C.F.R. § 120.140.

64.     Not disclosing Bridge Loans to the SBA was a violation of the SBA's regulation at 13 C.F.R. § 120.140.

65.     Not disclosing to the SBA the repayment of Bridge Loans with SBA loan proceeds was a violation of the SBA's regulation at 13 C.F.R. § 120.140.

11

EXHIBIT 1 PAGE 12

66.     Respondents violated the SBA's regulations by their participation in the Bridge Loan Scheme.

67.     The SBA's ethics regulation 13 C.F.R. § 120.140 mandates that any unethical behavior of Respondent Ponte and Ponte Investments must be promptly reported to the SBA by the Bank.

68.     Respondents Catanzaro never reported or caused to be reported to the SBA the unethical behavior of Respondent Ponte and Ponte Investments.

69.     Upon information and belief, Respondent Catanzaro never reported or caused to be reported the unethical behavior of Respondent Ponte and Ponte Investments to the SBA because Respondent Catanzaro participated in the Bridge Loan Scheme.

*Respondents concealed the Bridge Loans because they wanted the SBA Loans to be guaranteed by the SBA.*

70.     The SBA will not guarantee SBA Loans that materially fail to comply with any SBA Loan program requirements.

71.     Respondents caused or participated in the Bridge Loan Scheme in order to ensure that the SBA Loans would be guaranteed by the SBA.

72.     The existence of the SBA guarantee was critical to the profitability of the Bridge Loan Scheme.

73.     Upon information and belief, had the Bridge Loans (and their source of repayment) been properly disclosed to the SBA, the 201 SBA Loans may not have been guaranteed by the SBA.

74.     Without the SBA guarantee, the Bank may have been unable to sell the 201 SBA Loans with concealed Bridge Loans on the secondary market.

12

EXHIBIT 1 PAGE 13

*The Bridge Loan Scheme was unsafe and unsound.*

75.     As a result of Respondents causing or participating in the Bridge Loan Scheme,
the Bank's underwriters did not have a complete understanding of the borrowers' financial
condition, and therefore, were not able underwrite the 201 SBA Loans in a safe and sound
manner.

76.     Upon information and belief, had the Bridge Loans been properly disclosed, the
Bank may not have approved the SBA Loans.

*The Bridge Loan Scheme caused loss to the Bank and risk of loss and other damage*

77.     The SBA, due to mounting losses, took multiple and increasingly severe actions
against the Bank, ultimately resulting in the termination of the Bank's ability to make SBA-
guaranteed loans in November of 2019.

78.     On or about May 5, 2021, the Bank consented to the SBA's prohibition against
Respondent Catanzaro's participation in any facets of the Bank's SBA loan program.

79.     The termination of the Bank's ability to make SBA-guaranteed loans significantly
impacted the Bank's profitability.

80.     The SBA's actions were based, in part, on the Bank's unusually high loss rate on
the Bank's SBA loans.

81.     Had the SBA been aware of the Bridge Loan Scheme, under its regulations it
could have revoked the 85% guarantee on the Bank's SBA Loans.

82.     A revocation of the 85% guarantee could have resulted in the Bank being required
to repurchase the SBA Loans that were sold in the secondary market that subsequently defaulted.

83.     As a result of the defaults on 89 of the 201 SBA Loans that were made as part of
the Bridge Loan Scheme, the Bank was required to charge off approximately $1.6 million, while

13

EXHIBIT 1 PAGE 14

the SBA sustained an estimated loss of $8.8 million.  A revocation of the SBA's guarantee could result in the SBA's losses being shifted to the Bank.

*The Bridge Loan Scheme was a fraud on the SBA*

84.    The Bridge Loan Scheme was a fraud on the SBA.

85.    Each Respondent profited financially from the Bridge Loan Scheme to the detriment of the Bank and the SBA.

86.    Respondent Ponte extended very profitable Bridge Loans to SBA Loan applicants and then transferred the default risk to the SBA and the Bank when the SBA Loan proceeds were used to pay off the Bridge Loans.

87.    The Bank sold the guaranteed portion of the SBA Loans in the secondary market at a large premium.  With over 50% ownership of the Bank, Respondent Catanzaro benefited from the sale of the SBA Loans in the secondary market.

88.    Respondent Desrosiers, for her participation in the Bridge Loan scheme, received payments from Hydrangea Capital and Ponte Investments while employed at the Bank.

*Impermissible Fees*

89.    SBA regulations require that lenders follow all SBA Program Requirements, as interpreted by the SBA's standard operating procedure for the Lender and Development Company Loans Program (SBA SOP), which limits the amount of fees and expenses that can be collected from SBA Loan applicants.

90.    Under SBA regulations, as interpreted by the SBA SOP, fees cannot be charged for services that are not performed.

91.    Under SBA regulations, as interpreted by the SBA SOP, the cost of underwriting a loan cannot be charged to SBA Loan applicants.

14

EXHIBIT 1 PAGE 15

92.     Under SBA regulations, as interpreted by the SBA SOP, fees not expressly authorized to be charged to SBA Loan applicants are prohibited.

93.     Under SBA regulations, as interpreted by the SBA SOP, SBA Form 159(7a) must be filed to document any fees paid, *inter alia*, by the applicant of an SBA Loan.

94.     Respondent Ponte, as the sole owner of Ponte Investments, received fees paid by the SBA Loan borrowers, including a broker or referral fee.

95.     The amount of the broker or referral fee was often higher than the amount permitted by the SBA.

96.     Respondent Ponte, through Ponte Investments, also received an "Overall Business Analysis" fee.

97.     The "Overall Business Analysis" fee was impermissible and caused the amount charged to borrowers to further exceed the total amount permitted by the SBA.

98.     Respondent Ponte caused Ponte Investments to charge these impermissible fees to SBA Loan borrowers who were already in a precarious financial position.

99.     Respondent Desrosiers assisted Respondent Ponte and Ponte Investments with the scheme to charge impermissible fees to SBA Loan borrowers.

100.    Respondent Catanzaro's inadequate supervision over Respondent Ponte and Ponte Investments enabled impermissible fees to be charged to SBA Loan borrowers.

101.    Despite being put on notice from borrowers about impermissibly high fees charged by Ponte Investments, Respondent Catanzaro nevertheless enabled impermissible fees to be charged to SBA Loan borrowers.

102.    The Bank also regularly charged impermissible fees to SBA Loan applicants, including for services that the Bank did not perform.

15

EXHIBIT 1 PAGE 16

103.    On or about December 10, 2016, Respondent Catanzaro was informed by Respondent Ponte that one of the fees charged by the Bank to SBA loan applicants was deemed impermissible by the SBA.

104.    However, the Bank continued to charge the impermissible fee to SBA Loan applicants until late 2018.

105.    Respondent Catanzaro caused the Bank to charge impermissible fees to SBA Loan borrowers.

106.    During the Relevant Times, Respondent Ponte referred at least 201 SBA Loans with a Bridge Loan in place, or a greater number to be proven at hearing, to the Bank.

107.    Upon information and belief, the impermissible fees collected by Respondent Ponte from the applicants on SBA Loan was at least $326,000.

108.    Respondents Ponte and Catanzaro repeatedly signed SBA Form 159(7a)s that did not accurately disclose the fees charged to the SBA Loan borrowers.

109.    Respondents Ponte and Catanzaro knowingly or recklessly made false certifications on SBA Form 159(7a) to conceal impermissible fees from regulators, including the SBA.

110.    Under SBA rules and regulations, Respondent Ponte and/or the Bank could be required to reimburse affected customers for impermissible fees charged by Respondents.

*Other Misconduct*

111.    Upon information and belief, Respondent Ponte altered or caused to be altered certain SBA Loan borrowers' information to ensure that the Bank would approve the SBA Loans that Respondent Ponte caused Ponte Investments to refer to the Bank.

16

EXHIBIT 1 PAGE 17

*Genesis of the Fraudulent Bridge Loan Scheme*

112.    On or about September 29, 2016, Respondent Catanzaro was made aware by Bank employees that an SBA Loan borrower—referred by Respondent Ponte—was going to use proceeds of the SBA Loan at closing to pay-off a Bridge Loan.

113.    Respondent Catanzaro, in a series of emails, invited Respondent Ponte to conceal evidence of Respondent Ponte's Bridge Loan to the SBA Loan borrower and the Bridge Loan's repayment from SBA Loan proceeds.

114.    The SBA's regulations at 13 C.F.R. § 120.140, *inter alia*, prohibits self-dealing and conflicts of interest relating to SBA Loans.

115.    Respondent Catanzaro, in an email to Respondent Ponte, correctly identified the self-dealing/conflict-of-interest issue stemming from Ponte Investments' referral of an SBA Loan to the Bank while the applicant owed a debt to an affiliate of Ponte Investments.

116.    Respondent Catanzaro, in an email to Respondent Ponte, correctly informed him that the SBA demanded full disclosure and would never approve a transaction with a self-dealing/conflict-of-interest issue as outlined above.

117.    Respondent Ponte, in a series of emails, objected to Respondent Catanzaro's invitation to conceal evidence of the Bridge Loan Scheme and asserted that Respondent Ponte would be committing fraud if he complied with Respondent Catanzaro's request.

118.    Respondent Desrosiers also received Respondent Catanzaro's invitation to conceal evidence of the Bridge Loans and Mr. Ponte's objection that he would not participate in a fraud.

17

EXHIBIT 1 PAGE 18

119.     Despite his written objection, Respondent Ponte caused Ponte Investments to comply with Respondent Catanzaro's request to conceal the above Bridge Loan and the source of its repayment from SBA loan proceeds.

120.     As a result, the Bank's underwriters did not have an accurate and complete understanding of this SBA Loan application before the Bank approved and funded it.

121.     Upon information and belief, after this incident and at Respondent Catanzaro's request, Respondent Ponte concealed or caused Ponte Investments to conceal Bridge Loans and their repayment from SBA Loan proceeds.

122.     Upon information and belief, after this incident and at Respondent Catanzaro's request, Respondent Desrosiers, while an employee of the Bank, did not ensure that Bridge Loans and their repayment from SBA Loan proceeds were documented in applicant files.

*Exemplar Loans*

123.     The following exemplar SBA Loans, which were approved and funded by the Bank, were referred by Respondent Ponte with the participation of Respondents Catanzaro and Desrosiers.  These loans evidence and typify the Respondents' misconduct.

*SBA Loan A*

124.     In late 2016, Ponte Investments referred to the Bank a $150,000 SBA Loan (SBA Loan A) from a small auto-repair business.

125.     On or about October 8, 2016, Respondent Ponte sent an email to loan applicant A, using an email with the domain @sbaloanprogram.com, with several attachments.

126.     One of the attachments to the email was a letter dated October 8, 2016, with the header "SBA Loan Program" (and in smaller letters, "a division of Ponte Investments LLC"),

18

EXHIBIT 1 PAGE 19

which stated that loan applicant A had been pre-approved for an SBA Loan (the SBA Loan A Pre-Approval Letter).

127.    The SBA Loan A Pre-Approval Letter, *inter alia*, disclosed that loan applicant A would pay a 2% fee to the Bank and a 3.75% fee to www.sbaloanprogram.com.

128.    The SBA Loan A Pre-Approval Letter, *inter alia*, enclosed an invoice for an "Overall Business Analysis" for $1,295.

129.    On or about January 2017, loan applicant A obtained a Bridge Loan from Hydrangea Capital for $40,000 with a $55,000 payoff (Bridge Loan A).

130.    The interest rate on Bridge Loan A was approximately 77% per annum.

131.    In March 2017, Respondent Ponte caused Ponte Investments to provide the Bank with documentation regarding SBA Loan A. This documentation purported to identify the uses to which the SBA Loans proceeds would be applied, including those debts that would be paid off, as well as any other outstanding business debts. It did not disclose Bridge Loan A.

132.    On information and belief, Respondent Desrosiers was aware of Bridge Loan A, reviewed the application and file for SBA Loan A before it was submitted to the Bank, and did not notify underwriters at the Bank that Respondent Ponte had extended a Bridge Loan to loan applicant A.

133.    The Bank's review of SBA Loan A continued into the Spring and early Summer of 2017 because of numerous issues raised by Bank underwriters, including loan applicant A's questionable ability to service the debts that had been disclosed to the Bank and the large amount of past-due state taxes owed by loan applicant A.

134.    Due to loan applicant A's low SBA credit score, SBA Loan A could only be approved as an exception to Bank policy and therefore required three approvers at the Bank.

EXHIBIT 1 PAGE 20

135.    On or about May 22, 2017, the Bank's president declined SBA Loan A because, after his analysis, he did not believe SBA Loan A met prudent lending standards.

136.    On or about May 25, 2017, Respondent Catanzaro emailed Respondent Ponte and informed him that SBA Loan A would be difficult to approve.  Moments later, Respondent Ponte emailed back requesting Respondent Catanzaro's aid to get the loan approved and informing him that he had extended a Bridge Loan to SBA loan applicant A.

137.    Respondent Ponte informed Respondent Catanzaro via email that he no longer wanted the Bank's president to be involved with loans referred by Ponte Investments.

138.    Thereafter, the Bank's president no longer reviewed any SBA Loans referred by Ponte Investments.

139.     Upon information and belief, Respondent Catanzaro did not notify anyone at the Bank that Respondent Ponte had extended a Bridge Loan to loan applicant A.

140.    On or about May 25, 2017, a Bank director voted to decline SBA Loan A citing, *inter alia*, excessive business debt and questionable cash flow.

141.    On or about June 5, 2017, a revised credit memo was generated by the Bank after loan applicant A's SBA score improved to the point where approval of SBA Loan A would not require an exception to policy.

142.    Upon information and belief, loan applicant A's SBA score improved because, *inter alia*, he used a Bridge Loan A to pay-off some of his debts.

143.    The revised credit memo did not disclose Bridge Loan A.

144.    As a condition precedent to the SBA Loan A closing, a Bank director mandated that the back taxes owed to the state be paid in full prior to the closing of the loan.

20

EXHIBIT 1 PAGE 21

145.    On or about June 22, 2017, Respondent Ponte sent Respondent Catanzaro a bank document, signed by Respondent Ponte, purporting to evidence a wire transfer in the precise amount of back taxes from Hydrangea Capital to the state taxing authorities on behalf of loan applicant A (the Tax Wire document).

146.    The Tax Wire document was a forgery; no funds were distributed from Hydrangea Capital to the state.

147.    Upon information and belief, Respondents Ponte and Catanzaro used the Tax Wire document to evidence that SBA Loan A's condition precedent had been satisfied.

148.    The Bank approved SBA Loan A and funded it on June 26, 2017, for $150,000.

149.    A check from loan Applicant A to Hydrangea Capital was deposited on June 27, 2017, to pay-off the Bridge Loan.

150.    Starting in March of 2018, loan payments on SBA Loan A started to become late and/or sporadic.

151.    The Bank took a charge-off on SBA Loan A of $19,194.80 on December 31, 2019.

152.    Ethical violations, undisclosed debt refinance, and impermissible fees are grounds for the SBA, under their regulations, to revoke its guarantee.

153.    Had the SBA guarantee been revoked the Bank would have suffered an additional loss.

*SBA Loan B*

154.    On or about November 17, 2017, loan applicant B, a small construction company, was referred to the Bank by Respondent Ponte for a $150,000 SBA Loan (SBA Loan B).

21

EXHIBIT 1 PAGE 22

155.    On or about November 10, 2017, Respondent Ponte sent an email to loan applicant B, using an email with the domain @sbaloanprogram.com, with several attachments.

156.    The attached SBA Loan B Pre-Approval Letter, *inter alia*, disclosed that loan applicant B would pay a 2% fee to the Bank and a 4% fee to www.sbaloanprogram.com.

157.    The SBA Loan B Pre-Approval Letter, *inter alia*, enclosed an invoice for an additional fee of $1,595 for "Overall Business Analysis" to be paid "after all financial documents have been reviewed and approved" (the Small Business B fee).

158.    The above fees are impermissible under SBA regulations, as interpreted by the SBA SOP in effect at the time.

159.    A Bridge Loan was offered to SBA Loan applicant B by Respondent Ponte while loan applicant B was applying for the SBA Loan B.

160.    On or about December 18, 2017, loan applicant B executed an agreement with Respondent Ponte for a $40,000 extension of credit (1st Bridge Loan B).

161.    The 1st Bridge Loan B had a payback amount of $52,000.

162.    The terms of the 1st Bridge Loan B included a 90-day maturity and $965 in fees.

163.    A payback amount of $52,000 with a fee of $965 is equivalent to a 32.41% quarterly interest rate or a 129.65% annual interest rate.

164.    On or about December 19, 2017, the application and file for SBA Loan B was submitted to the Bank.

165.    Upon information and belief, Respondent Desrosiers reviewed the application and file for SBA Loan B before it was submitted to the Bank.

166.    Documents pertaining to SBA Loan B, which were prepared by John Ponte and Respondent Desrosiers, were submitted to the Bank and did not disclose the 1st Bridge Loan B.

22

EXHIBIT 1 PAGE 23

167.    Some written information on SBA Loan B's application, including evidence of the 1st Bridge Loan B, was deleted using correction fluid.

168.    Upon information and belief, Respondent Ponte deleted or caused to be deleted the evidence of the 1st Bridge Loan B on documents submitted to the Bank.

169.    On or about December 14, 2017, the Bank ran a UCC filing search to verify the debts of loan applicant B.

170.    A UCC filing is used by lenders to announce in the public record their rights to collateral or liens on secured loans.

171.    The Bank ran UCC filing searches on SBA Loan applicants because an applicant's debt burden is a material piece of information for underwriting an SBA Loan.

172.    Upon information and belief, Respondent Ponte did not file a UCC filing to secure the 1st Bridge Loan B.

173.    Upon information and belief, a UCC filing was not filed to secure the 1st Bridge Loan B in order to conceal it from the Bank.

174.    On December 20, 2017, the 1st Bridge Loan B was funded via a wire transfer in the amount of $39,035 from Ponte Investments' checking account to loan applicant B's account at another institution.

175.    On information and belief, Respondent Desrosiers prepared the wire for the 1st Applicant B Bridge Loan.

176.    On or about December 28, 2017, a second Bridge Loan in the amount of $12,000 was offered to loan applicant B by Respondent Ponte (2nd Bridge Loan B).

177.    On or about January 2, 2018, loan applicant B executed an agreement for a 2nd Bridge Loan B.

23

EXHIBIT 1 PAGE 24

178.    The 2nd Bridge Loan B had a 90-day maturity, a payback amount of $16,800, and included $765 in fees.

179.    A payback amount of $16,800 with a fee of $765 is equivalent to a 46.37% quarterly interest rate or a 185.55% annual interest rate.

180.    The 2nd Bridge Loan B required loan applicant B to provide an executed check in the amount of $16,800, to be held by Ponte Investments to ensure the repayment of the Bridge Loan.

181.    On or about January 3, 2018, loan applicant B sent an email to Ponte Investments with an attachment. The attachment was an image of an undated executed check numbered #7699, in the amount of $16,800, made payable to Ponte Investments.

182.    Loan applicant B's check #7699 was the repayment for 2nd Bridge Loan B and was immediately cashed when Ponte Investments was notified by the Bank that the Bank had funded SBA Loan B.

183.    On or about January 5, 2018, Ponte Investments wired $11,235 to loan applicant B's bank.

184.    Upon information and belief, Respondent Desrosiers sent the $11,235 wire for the 2nd Bridge Loan B.

185.    Respondent Desrosiers failed to ensure that any of loan applicant B's Bridge Loans were reflected in the loan files submitted of the Bank.

186.    On January 17, 2018, loan applicant B completed and executed all SBA Loan documents.

187.    The Bank's loan file for SBA Loan B does not evidence any of the Bridge Loans made to loan applicant B.

24

EXHIBIT 1 PAGE 25

188.    Respondent Ponte reviewed and prepared all the SBA Loan files to be uploaded to the Bank.

189.    Respondent Ponte failed to document or verify that the Bridge Loans were documented in the files submitted to the Bank.

190.    The Bank's loan file for SBA Loan B evidences that loan applicant B's owner's compensation from 2014 through 2016 averaged $38,500. However, no expense for owner's compensation was included in loan applicant B's 2017 net income.

191.    The effect of not including owner's compensation in 2017 was to artificially raise loan applicant B's net income and debt-service coverage ratio.

192.    The debt-service coverage ratio is a measurement of a business's available cash flow to pay current debt obligations. The debt-service coverage ratio shows banks whether a business has enough income to pay its debts.

193.    Loan applicant B's profit and loss summary from 2014 to 2017 in the Bank's loan file evidences that a portion of owner's compensation from 2014 through 2016 was added back to earnings.

194.    The result of adding back a portion of owner's compensation to earnings was to artificially boost loan applicant B's debt-service coverage ratio above one (1).

195.    Under Bank policy, the Bank would not approve an SBA Loan if the debt-service coverage was below one (1).

196.    Upon information and belief, Respondent Ponte, when preparing the loan summary to be uploaded to the Bank, altered or caused to be altered loan applicant B's financial information to ensure the Bank would approve the SBA Loan.

EXHIBIT 1 PAGE 26

197.    On or about January 17, 2018, a $150,000 SBA Loan B was approved by the Bank.

198.    On or about January 18, 2018, the Bank disbursed $141,531.03 to loan applicant B.

199.    The remaining balance on the $150,000 SBA Loan B ($8,468.97 or 5.64% of the loan proceeds) was used to pay fees and expenses to the Bank and Respondent Ponte through Ponte Investments.

200.    SBA Form 159(7a) for SBA Loan B evidences that the Bank was paid $3,000 (2% of SBA Loan B) by loan applicant B for packaging.

201.    Upon information and belief, the Bank did not perform any packaging services.

202.    The Bank did not attach a separate schedule to SBA Form 159(7a) that itemized fees; such itemization was required by SBA regulations.

203.    Upon information and belief, the Bank did not itemize the fees because it performed no service it could permissibly itemize.

204.    SBA Form 159(7a) for the SBA Loan B evidences that Ponte Investments was paid $3,000 (2% of SBA Loan B) from the loan proceeds of SBA Loan B for broker and referral services.

205.    The SBA Loan B Pre-Approval Letter evidences that Respondent Ponte charged SBA Loan applicant B a 4% fee for their services.  However, only a 2% fee was disclosed on the SBA Form 159(7a).

206.    In addition, Respondent Ponte did not disclose on SBA Form 159(7a) the $1,595 Small Business B fee.

EXHIBIT 1 PAGE 27

207.    Upon information and belief, Respondent Ponte did not disclose the portion of the broker and referral fee above 2% or the $1,595 Small Business B fee because he knew that these fees were impermissible under SBA regulations.

208.    Upon information on belief, Respondent Desrosiers was also aware of the above impermissible fees and assisted Respondent Ponte in charging them.

209.    On or about January 18, 2018, the Bank wired $141,531.03 to loan applicant B and, on the same day, the proceeds of SBA Loan B were used to repay both Bridge Loans extended to loan applicant B.

210.    The Bank's SBA Form 1920 did not disclose that the proceeds of SBA Loan B were used to repay the Bridge Loans.

211.    On or about January 18, 2018, Ponte Investments deposited loan applicant B's check #7698 in the amount of $52,000 as a repayment for the 1st Bridge Loan B.

212.    On or about January 18, 2018, Ponte Investments deposited loan applicant B's check #7699 in the amount of $16,800 as a repayment for the 2nd Bridge Loan B.

213.    On or about April 1, 2018, less than 3 months after being funded, SBA Loan B defaulted.

214.    On or about June 14, 2018, the Bank sent a letter to the SBA (the SBA Loan B Letter) to request that the SBA transfer the SBA Loan B from servicing to liquidation status.

215.    In the SBA Loan B Letter, the Bank requested that the SBA purchase SBA Loan B from the secondary market.

216.    The Bridge Loans were not disclosed in the SBA Repurchase Package Under the "Use of Proceeds – Debt Refinance / Payment of Trade Accounts / Interim & Bridge Loans" section of the SBA Repurchase Package.

27

EXHIBIT 1 PAGE 28

217.    On or about June 14, 2018, the Bank charged off the non-guaranteed portion of SBA Loan B held on its balance sheet, sustaining a loss of $22,356.51.

218.    The SBA suffered a loss when it repurchased the 85% guaranteed portion of SBA Loan B in the secondary market.

219.    Ethical violations, undisclosed debt refinance, and impermissible fees are grounds for the SBA, under their regulations, to revoke its guarantee.

220.    Had the SBA guarantee been revoked the Bank would have suffered an additional loss.

*SBA Loan C*

221.    Loan applicant C owned a restaurant and a lodging facility and contacted Ponte Investments for an SBA Loan.

222.    Respondent Ponte referred loan applicant C's SBA Loan to the Bank, and on August 17, 2017, loan applicant C received a $150,000 SBA Loan from the Bank (1st SBA Loan C).

223.    Immediately after 1st SBA Loan C closed, loan applicant C began the application process for an SBA Loan for its lodging business (2nd SBA Loan C).

224.    On or about August 21, 2017, Respondent Ponte sent an email to loan applicant C stating, *inter alia*, that loan applicant C had been pre-approved for an SBA Loan and would pay a 2% fee to the Bank and a 3.75% fee to Ponte Investments.

225.    The August 21, 2017 email, *inter alia*, enclosed an invoice for an additional fee of $1,395 for "Overall Business Analysis" to be paid "after all financial documents have been reviewed and approved" (Small Business C fee).

28

EXHIBIT 1 PAGE 29

226.    On or about August 31, 2017, the Bank, via an email, informed Ponte Investments that the Bank could not process the SBA Loan until 90 days had elapsed.

227.    Respondent Ponte offered loan applicant C a revolving line of credit (Bridge Loan C) until the Bank could offer them a 2nd SBA Loan.

228.    Upon information and belief, on or about November 16, 2017, loan applicant C, out of a pressing need for liquidity, agreed to the terms of Bridge Loan C.

229.    Bridge Loan C included terms requiring monthly payments of 6% of any outstanding principal.

230.    The 6% monthly fee equates to an annual interest rate of 72%.

231.    Upon information and belief, loan applicant C lacked financial sophistication and misunderstood the terms of the Bridge Loan C believing the 6% to be an annual rate.

232.    Between about November 16, 2017 and January 15, 2018, loan applicant C made six separate draws on Bridge Loan C totaling $85,000.

233.    Upon information and belief, Respondent Desrosiers was aware of Bridge Loan C and the associated draws.

234.    On or about December 13, 2017, the Bank obtained results of a UCC filing search showing a Hydrangea Capital lien on loan applicant C.

235.    Respondent Catanzaro knew or should have known that the UCC filing indicated that loan applicant C had a Bridge Loan with Hydrangea Capital.

236.    On or about December 13, 2017, Respondent Catanzaro emailed Respondent Ponte with a terse demand: "[loan applicant C]: UCC filed on the 29th Nov.; need to know the debt amount and update the CRO; adjust lien position or terminate the new lien."

237.    Respondent Ponte immediately replied that he would terminate the UCC filing.

29

EXHIBIT 1 PAGE 30

238.    On or about December 14, 2017, Hydrangea Capital terminated its lien position on loan applicant C; however, Bridge Loan C had not been repaid.

239.    Upon information and belief, Respondent Ponte, after terminating the UCC filing, did not inform the Bank that Bridge Loan C was still outstanding.

240.    Respondent Ponte never provided the Bank with the amount or terms of Bridge Loan C.

241.    Respondent Catanzaro knew or should have known that removing the UCC filing did not evidence that the Bridge Loan C had been paid off.

242.    Respondent Catanzaro knew or should have known that Bridge Loan C was still outstanding.

243.    On or about December 19, 2017, Respondent Desrosiers ran a new UCC Search to confirm for Respondent Catanzaro that the Hydrangea Capital UCC had been terminated.

244.    Upon information and belief, Respondent Catanzaro and Respondent Desrosiers were aware that Ponte Investments and Hydrangea Capital did not require a payoff of a Bridge Loan prior to terminating a UCC filing.

245.    Respondent Catanzaro never inquired whether Bridge Loan C was still outstanding or took any action to ensure that the Bridge loan was documented in the Bank's files.

246.    Upon information and belief, Respondent Desrosiers did not ensure that the Bridge Loan C was documented in the Bank's files.

247.    On or about December 27, 2017, the Bank closed and funded 2nd SBA Loan C in the amount of $125,000.

248.    None of the documents in the Bank's loan file for the 2nd SBA Loan C disclosed Bridge Loan C.

30

EXHIBIT 1 PAGE 31

249.    Respondent Ponte caused Ponte Investments to charge SBA Loan applicant C a 3.75% fee on the 2nd SBA Loan C.

250.    A 3.75% fee was impermissible under SBA regulations, as interpreted by the SBA SOP in effect at the time.

251.    Respondent Ponte did not disclose the 3.75% fee charged on the 2nd SBA Loan C on the SBA's forms.  Respondent Ponte only disclosed a 2% fee.

252.    Respondent Ponte did not disclose the Small Business C fee charged on the 2nd SBA Loan C on the SBA's forms.

253.    Upon information and belief, Respondent Ponte did not disclose the above impermissible fees because Respondent Ponte knew the fees were impermissible under SBA regulations.

254.    Respondent Ponte knowingly or recklessly made false certifications on SBA Form 159(7a) to conceal the impermissible fees charged to loan applicant C from regulators, including the SBA.

255.    Upon information on belief, Respondent Desrosiers was also aware of the above impermissible fees and assisted Respondent Ponte in charging them.

256.    On or about January 29, 2018, after the Bank closed and funded the 2nd SBA Loan C, Respondent Ponte caused Hydrangea capital to refile its UCC lien on loan applicant C.

257.    On or about June 13, 2018, loan applicant C emailed Respondent Ponte, stating that the monthly 6% interest rate on the Bridge Loan C was placing his business in jeopardy.

258.    Respondent Ponte refused to provide any relief on the 72% annual interest rate and instead proposed to obtain a third SBA Loan to repay Bridge Loan C.

31

EXHIBIT 1 PAGE 32

259.    On or about June 20, 2018, Respondent Ponte referred the 3rd SBA Loan C to the Bank.

260.    One of the documents uploaded to the Bank by Ponte Investments was loan applicant C's current business-debt schedule.

261.    Loan applicant C's business debt schedule did not disclose Bridge Loan C.

262.    It appears that loan applicant C's business debt schedule, submitted to the Bank by Ponte Investments, was altered using correction fluid.

263.    Upon information and belief, Respondent Ponte deleted or caused to be deleted evidence of Bridge Loan C on the business debt schedule.

264.    On or about June 22, 2018, a Bank employee emailed Respondent Ponte to request a complete debt summary for loan applicant C.

265.    On or about June 25, 2018, Respondent Ponte provided the Bank a business debt summary that did not include Bridge Loan C.

266.    On or about July 16, 2018, a Bank employee emailed Respondent Ponte, stating that the employee would process the 3rd SBA Loan C and requesting, *inter alia*, that "UCC dated 1/29 to be terminated."

267.    Respondent Catanzaro was copied on the above email.

268.    On or about July 16, 2018, Respondent Desrosiers, now an employee of Ponte Investments, emailed the Bank with an attachment evidencing the termination of the UCC filing on loan applicant C.

269.    Upon information and belief, Respondent Ponte did not inform the Bank that the Bridge Loan C was still outstanding.

32

EXHIBIT 1 PAGE 33

270.     Respondent Catanzaro knew or should have known that the refiling of the UCC on loan applicant C, approximately 2 weeks after the UCC had been removed and the 2nd SBA Loan C had been closed, was evidence that a Bridge Loan was still outstanding on loan applicant C.

271.     Respondent Catanzaro took no steps to ensure that the Bank's loan file accurately reflected loan applicant's C debts.

272.     Respondent Catanzaro did not inform the Bank's regulators, including the SBA, of Respondent Ponte's unethical behavior.

273.     On or about July 20, 2018, the Bank produced a loan and credit memo that did not disclose Bridge Loan C.

274.     On or about July 25, 2018, Ponte Investments emailed loan applicant C wiring instructions for the $78,415 payoff of Bridge Loan C.

275.     On or about July 27, 2018, the Bank closed and funded the $150,000 3rd SBA Loan C.

276.     The Bank's SBA Form 1920, signed by Respondent Catanzaro, did not disclose that the proceeds of the 3rd SBA Loan C were used to repay Bridge Loan C.

277.     Loan applicant C used $78,415 of the proceeds of 3rd SBA Loan C to repay Bridge Loan C.

278.     On or about July 27, 2018, Hydrangea Capital received a wire transfer of $78,415 from loan applicant C.

279.     Approximately a year later, on July 12, 2019, both of loan applicant C's businesses filed a Chapter 11 Bankruptcy petition in U.S. Bankruptcy Court.

EXHIBIT 1 PAGE 34

280. The Bank charged off the non-guaranteed portion of the three loan applicant C's SBA Loans, sustaining an aggregate loss amount of $48,867.

281. The SBA suffered a loss when it repurchased the guaranteed portion of the three loan applicant C's SBA SLA loans in the secondary market.

282. Ethical violations, undisclosed debt refinance, and impermissible fees are grounds for the SBA, under their regulations, to revoke its guarantee.

283. Had the SBA guarantee been revoked the Bank would have suffered an additional loss.

*SBA Loan D*

284. On or about May 26, 2017, loan applicant D, a packaging and crating firm, contacted Respondent Ponte through Ponte Investments' www.sbaloanprogram.com portal, requesting an SBA loan.

285. On or about May 26, 2017, Ponte Investments, using an email with the domain @sbaloanprogram.com, informed loan applicant D that loan applicant D's SBA loan application "has been approved."

286. Loan applicant D responded to the May 26, 2017, email that the business wanted an SBA loan for $350,000 in order to refinance debt.

287. Respondent Ponte, using an email with the domain @sbaloanprogram.com, wrote back, *inter alia*, "we can do the 350k".

288. Upon information and belief, Respondent Ponte made a deceptive statement to loan applicant D regarding the potential $350,000 loan because he knew the Bank was limited to approving and funding SBA loan amounts up to $150,000.

34

EXHIBIT 1 PAGE 35

289.    On or about May 28, 2017, Respondent Ponte sent an email to loan applicant D, using an email with the domain @sbaloanprogram.com, with several attachments.

290.    In the May 28, 2017, email, Respondent Ponte further wrote, "once I receive your Financials I will issue the higher loan amount".

291.    One of the attachments to Ponte's May 28, 2017, email was a letter, which contained the header "SBA Loan Program" (and in smaller letters "a division of Ponte Investments") that stated, *inter alia*, that loan applicant D had been pre-approved for a 10-year loan for $150,000 with fees of 2% to the Bank and 3.75% to www.sbaloanprogram.com. (Loan D Pre-Approval letter).

292.    The May 28, 2017, email also included an invoice from Ponte Investments for $1,395. The Invoice stated it was for an "Overall Business Analysis" (Small Business D fee).

293.    Loan applicant D's balance sheet in the Bank's loan file is inconsistent with the business debt summary in the loan file.

294.    Loan applicant D's income statement in the Bank's loan files evidences that no interest expense was reported for 2017 despite significant reported debt on the balance sheet and business debt summary.

295.    By not accurately reporting expenses, loan applicant D's income was artificially increased.

296.    Upon information and belief, Respondent Ponte altered or caused to be altered applicant D's financials to ensure that the Bank would approve SBA Loan D.

297.    On or about September 20, 2017, loan applicant D's $150,000 SBA Loan was closed and funded (1st SBA Loan D).

35

EXHIBIT 1 PAGE 36

298.    SBA Form 159(7a) for the 1st SBA Loan D evidences that Ponte Investments was paid $3,000 (2% of 1st SBA Loan D) by loan applicant D for broker and referral services.

299.    The Loan D Pre-Approval Letter for the 1st SBA Loan D evidences that Respondent Ponte charged loan applicant D a 3.75% fee for their services.  However, only a 2% fee was disclosed on SBA Form 159(7a) in connection with 1st SBA Loan D.

300.    Moreover, Respondent Ponte did not disclose on SBA Form 159(7a) the Small Business D fee for the 1st SBA Loan D.

301.    Upon information and belief, Respondent Ponte did not disclose the above fees because Respondent Ponte knew the fees were impermissible under SBA regulations.

302.    Upon information on belief, Respondent Desrosiers was also aware of the above impermissible fees and assisted Respondent Ponte in charging them.

303.    On or about September 20, 2017, after receiving the funds from 1st SBA Loan D, loan applicant D emailed Respondent Ponte requesting additional funding.

304.    Respondent Ponte instructed a Ponte Investments employee to offer loan applicant D a line of credit.

305.    On or about September 20, 2017, loan applicant D executed a Business Line of Credit Agreement with Hydrangea Capital (Bridge Loan D).

306.    The terms of Bridge Loan D included a monthly 5% fee of the outstanding balance.

307.    The 5% monthly fee equates to an annual interest rate of 60%.

308.    On or about September 27, 2017, loan applicant D drew $30,000 from Bridge Loan D.

36

EXHIBIT 1 PAGE 37

309.    On or about October 6, 2017, Hydrangea Capital filed a UCC filing on loan applicant D.

310.    On or about November 21, 2017, loan applicant D drew another $20,000 on Bridge Loan D.

311.    On or about May 10, 2018, loan applicant D emailed Ponte Investments, inquiring about a new SBA loan to pay-off Bridge Loan D.

312.    On or about May 11, 2018, loan applicant D sent an application for a 2nd SBA Loan, along with additional documents—including an updated business-debt summary.

313.    The May 11, 2018, updated business debt summary lists three debts, including the Bridge Loan D.

314.    However, the updated May 11, 2018, business debt summary in the Bank's loan file did not disclose Bridge Loan D.

315.    The section on Applicant D's updated May 11, 2018, business debt summary that evidenced Bridge Loan D was covered in correction fluid.

316.    Upon information and belief, Respondent Ponte concealed or caused to be concealed Bridge Loan D on the updated May 11, 2018, business debt summary.

317.    On or about June 28, 2018, a Bank employee emailed Respondent Ponte requesting the termination of the Hydrangea Capital UCC filing on loan applicant D.

318.    On or about June 29, 2018, Respondent Ponte terminated or caused to be terminated the Hydrangea Capital UCC filing on loan applicant D.

319.    Upon information and belief, Respondent Ponte did not inform the Bank that the Bridge Loan D was still outstanding.

37

EXHIBIT 1 PAGE 38

320.     On or about July 10, 2018, a Bank employee emailed Respondent Ponte to inform him that loan applicant D had a past-due IRS personal income-tax liability of $17,000 from 2017.

321.     On or about July 10, 2018, a Bank employee produced a Loan and Credit Memorandum noting the $17,000 personal tax liability and stating that loan applicant D would provide an IRS-approved payment plan prior to closing.

322.     The Loan and Credit Memorandum did not disclose Bridge Loan D.

323.     On or about July 24, 2018, a Ponte Investments employee emailed the Bank that the past due "taxes have been paid".

324.     However, the July 24, 2018, email did not disclose the source of the funds to pay-off the IRS tax liability—a loan from Hydrangea Capital.

325.     On or about July 25, 2018, $17,567.87 was debited from Hydrangea Capital's bank account at another institution.  Payment was credited to the IRS on behalf of loan applicant D.

326.     Upon information and belief, Respondent Ponte believed the Bank would not approve the 2nd SBA Loan D while loan applicant D had an outstanding IRS tax liability.

327.     Upon information and belief, Respondent Ponte caused Hydrangea Capital to pay loan applicant D's IRS tax liability.

328.     Upon information and belief, Respondent Ponte's goal, when paying the IRS liability, was to ensure the Bank would approve the 2nd SBA Loan D so that the Applicant D Bridge Loan could be paid-off.

329.     On or about July 24, 2018, Ponte Investments emailed loan applicant D wiring instructions to repay the $68,703 owed to Hydrangea Capital.

38

EXHIBIT 1 PAGE 39

330.    The $68,703 consisted of the $30,000 draw, the $20,000 draw, interest, and the $17,567.87 payment made to the IRS from Hydrangea Capital's bank account.

331.    On or about July 25, 2018, the Bank closed and funded the 2nd SBA Loan D.

332.    On or about July 25, 2018, Hydrangea Capital received a wire transfer for $68,703 from loan applicant D.

333.    The Bank's SBA Form 1920 did not disclose that the proceeds of the 2nd SBA Loan D were used to repay Bridge Loan D.

334.    Starting on or around October 1, 2019, loan applicant D stopped repaying the 1st SBA Loan D and the 2nd SBA Loan D.

335.    The Bank charged off the non-guaranteed portions of the 1st SBA Loan D and 2nd SBA Loan D held on its balance sheet, sustaining a loss of $35,824.97.

336.    The SBA suffered a loss when it repurchased the 85% guaranteed portion of the 1st SBA Loan D and 2nd SBA Loan D in the secondary market.

337.    Ethical violations, undisclosed debt refinance, and impermissible fees are grounds for the SBA, under their regulations, to revoke its guarantee.

338.    Had the SBA guarantee been revoked the Bank would have suffered an additional loss.

*Respondent Desrosiers's Undisclosed Conflicts of Interest*

339.    In 2016, Respondent Desrosiers, while an officer of the Bank, was relocated to work out of the office of Ponte Investments to improve the coordination between the Bank and Ponte Investments.

340.    Respondent Desrosiers's role was to be the liaison between Ponte Investments and the Bank.

39

EXHIBIT 1 PAGE 40

341.    At the time, Respondent Desrosiers's official title was Chief Operating Officer of the Bank, and she was listed in the Bank's records as an executive officer for purposes of Federal Reserve Board Regulation O.

342.    Sometime after relocating her office to that of Ponte Investments, and while still an officer and employee of the Bank, Respondent Desrosiers and Respondent Ponte developed a romantic relationship.

343.    Respondent Desrosiers did not disclose her relationship with Respondent Ponte to the Bank's Board, as required by the Bank's Code of Ethics/Conflict of Interest and Whistleblower Policy (Ethics Policy).

344.    Beginning on at least January 6, 2017, while an employee of the Bank, Respondent Desrosiers received regular payments from Hydrangea Capital and/or Ponte Investments.

345.    From January through August 2017, Respondent Desrosiers received payments from Hydrangea Capital or Ponte Investments approximately weekly and normally in the amount of $1,000 to $1,500.

346.    By September 2017, the weekly payments to Respondent Desrosiers were coming exclusively from Hydrangea Capital and had increased to $2,000.

347.    Beginning in November 2017, the weekly payments from Hydrangea Capital to Respondent Desrosiers increased again to $2,500.

348.    These regular payments from Hydrangea Capital to Respondent Desrosiers continued through and after Respondent Desrosiers's resignation from the Bank effective January 31, 2018.

EXHIBIT 1 PAGE 41

349.    In addition to regular payments, Respondent Desrosiers would, from time to time, receive additional or larger payments, ranging up to $9,000.

350.    Respondent Desrosiers received in excess of $120,000 in direct payments from Ponte Investments and Hydrangea Capital from January 6, 2017, through her resignation from the Bank effective January 31, 2018.

351.    In addition to direct payments to Respondent Desrosiers, Ponte Investments began making payments on a Mercedes-Benz in Respondent Desrosiers's name starting on or about July 24, 2017.

352.    Respondent Desrosiers did not disclose the above payments to the Bank.

353.    In February 2017, the Bank's Board, having become aware of the romantic relationship between Respondents Desrosiers and Ponte, removed Respondent Desrosiers as Chief Operating Officer and an Executive Officer and gave her the title of Executive Vice President of ISO Lending Operations.

354.    Over time, Respondent Desrosiers began to take on roles and responsibilities of a Ponte Investments senior employee.  This progression occurred even while she was still employed by the Bank and had responsibilities for Bank loans referred by Ponte Investments to the Bank.

355.    While still an officer of the Bank, Respondent Desrosiers was issued and began using a Ponte Investments email address.

356.    While still an officer of the Bank, Respondent Desrosiers would correspond directly with borrowers about loans using her Ponte Investments email address, without disclosing which entity she worked for.

41

EXHIBIT 1 PAGE 42

357.    Beginning in March of 2017 and while still an officer of the Bank, Respondent Desrosiers was placed as an authorized signer on various bank accounts of Ponte Investments and Hydrangea Capital.

358.    After she had account-signing authority but while still employed by the Bank, Respondent Desrosiers began participating in the Bridge Loans Scheme including communicating with and wiring Bridge Loan funds to borrowers and tracking Bridge Loan originations and payments.

359.    After she obtained account-signing authority but while she was still employed by the Bank, Respondent Desrosiers began participating in the collection of impermissible fees by Ponte Investments, including sending invoices for fees to SBA Loan borrowers.

360.    In May 2017, while still serving as an officer of the Bank, Respondent Desrosiers took over responsibility for payroll at Ponte Investments.

361.    In August 2017, while still serving as an officer of the Bank, Respondent Desrosiers assumed the title of Director of Operations for Ponte Investments.

362.    Beginning in at least December 2017, while still serving as an officer of the Bank, Respondent Desrosiers had a business credit card from Hydrangea Capital in her name.

363.    Following her resignation from the Bank effective January 31, 2018, Respondent Desrosiers continued to work at Ponte Investments.

364.    Respondent Desrosiers's actions described in the above paragraphs constituted conflicts of interest that were prohibited by the Bank's Ethics Policy.

365.    The Bank's Ethics Policy required immediate disclosure of conflicts of interest to the Bank's Board of Directors.

EXHIBIT 1 PAGE 43

366.    Respondent Desrosiers never disclosed her conflicts of interest to the Bank's Board of Directors.

367.    The Bank's Ethics Policy also required a yearly Conflicts of Interest Disclosure Statement be signed by each employee.

368.    Respondent Desrosiers signed a Bank Conflicts of Interest Disclosure Statement on or about September 28, 2017, that did not list any conflicts of interest.

## III.    Conclusions of Law

*Respondent Catanzaro*

369.    Based on the misconduct described above, Respondent Catanzaro violated and caused the Bank to violate regulations under 12 U.S.C. § 1818(e) and (i)(2).

370.    Based on the misconduct described above, Respondent Catanzaro recklessly engaged or participated in unsafe or unsound practices in connection with the Bank under 12 U.S.C. § 1818(e) and (i)(2).

371.    Respondent Catanzaro's acts, omissions, and practices described above were breaches of Respondent's fiduciary duties as an officer or director of the Bank under 12 U.S.C. § 1818(e) and (i)(2).

372.    Respondent Catanzaro's violations, practices, and breaches described above resulted in more than a minimal loss, likely financial loss, and other damage to the Bank under 12 U.S.C. § 1818(e) and (i)(2).

373.    Respondent Catanzaro's violations, practices, and breaches described above resulted in Respondent Catanzaro's financial gain or other benefit under 12 U.S.C. § 1818(e) and (i)(2).

EXHIBIT 1 PAGE 44

374.    Respondent Catanzaro's violations, practices and breaches described above demonstrate Respondent Catanzaro's personal dishonesty under 12 U.S.C. § 1818(e).

375.    Respondent Catanzaro's violations, practices, and breaches described above demonstrate Respondent's willful or continuing disregard for the safety or soundness of the Bank under 12 U.S.C. § 1818(e).

376.    Respondent Catanzaro's violations, practices, and breaches described above were part of a pattern of misconduct under 12 U.S.C. § 1818(i)(2).

*Respondent Desrosiers*

377.    Based on the misconduct described above, Respondent Desrosiers violated and caused the Bank to violate regulations under 12 U.S.C. § 1818(e) and (i)(2).

378.    Based on the misconduct described above, Respondent Desrosiers recklessly engaged or participated in unsafe or unsound practices in connection with the Bank under 12 U.S.C. § 1818(e) and (i)(2).

379.    Respondent Desrosiers's acts, omissions, and practices described above were breaches of Respondent's fiduciary duties as an officer of the Bank under 12 U.S.C. § 1818(e) and (i)(2).

380.    Respondent Desrosiers's violations, practices and breaches described above resulted in more than a minimal loss, likely financial loss, and other damage to the Bank under 12 U.S.C. § 1818(e) and (i)(2).

381.    Respondent Desrosiers's violations, practices, and breaches described above resulted in Respondent Desrosiers's financial gain and other benefit under 12 U.S.C. § 1818(e) and (i)(2).

EXHIBIT 1 PAGE 45

382.     Respondent Desrosiers's violations, practices and breaches described above demonstrate Respondent Desrosiers's personal dishonesty under 12 U.S.C. § 1818(e).

383.     Respondent Desrosiers's violations, practices and breaches described above demonstrate Respondent's willful or continuing disregard for the safety or soundness of the Bank under 12 U.S.C. § 1818(e).

384.     Respondent Desrosiers's violations, practices and breaches described above were part of a pattern of misconduct under 12 U.S.C. § 1818(i)(2).

*Respondent Ponte*

385.     Respondent Ponte's violations and practices described above resulted in Respondent Ponte being unjustly enriched under 12 U.S.C. § 1818(b).

386.     Respondent Ponte's violations and practices described above involved a reckless disregard for applicable regulations under 12 U.S.C. § 1818(b).

387.     Based on the misconduct described above, Respondent Ponte violated and caused the Bank to violate regulations under 12 U.S.C. § 1818(e) and (i)(2).

388.     Based on the misconduct described above, Respondent Ponte recklessly engaged in unsafe or unsound practices in connection with the Bank under 12 U.S.C. § 1818(e) and (i)(2).

389.     Respondent Ponte's violations and practices described above resulted in more than a minimal loss, likely financial loss, and other damage to the Bank under 12 U.S.C. § 1818(e) and (i)(2).

390.     Respondent Ponte's violations and practices described above resulted in Respondent Ponte's financial gain and other benefit under 12 U.S.C. § 1818(e) and (i)(2).

391.     Respondent Ponte's violations and practices described above demonstrated Respondent Ponte's personal dishonesty under 12 U.S.C. § 1818(e).

45

EXHIBIT 1 PAGE 46

392.    Respondent Ponte's violations and practices described above demonstrated Respondent's willful or continuing disregard for the safety or soundness of the Bank under 12 U.S.C. § 1818(e).

393.    Respondent Ponte's violations, and practices described above were part of a pattern of misconduct under 12 U.S.C. § 1818(i)(2).

## ORDERS TO PAY

Based on the above Findings of Fact and Conclusions of Law, the FDIC determined that Respondents Catanzaro's, Respondent Desrosiers's, and Respondent Ponte's violations, practices, and breaches merit civil money penalties. After taking into account the appropriateness of the penalties with respect to the following mitigating factors under 12 U.S.C. § 1818(i)(2)(G): size of each Respondent's financial resources and good faith, the gravity of the violations, the history of previous violations, and such other matters as justice may require, it is:

ORDERED that by reason of Respondent Catanzaro's violations, practices, and breaches listed above, a $400,000 penalty is assessed against Respondent Catanzaro under 12 U.S.C. § 1818(i)(2).

ORDERED that by reason of Respondent Desrosiers's violations, practices, and breaches listed above, a $128,000 penalty is assessed against Respondent Desrosiers under 12 U.S.C. § 1818(i)(2).

ORDERED that by reason of Respondent Ponte's violations and practices listed above, a $74,000 penalty is assessed against Respondent Ponte under 12 U.S.C. § 1818(i)(2).

FURTHER ORDERED that the Orders to Pay are stayed until 20 days after the date of service of this Notice of Assessment to allow each Respondent time to object to the Order to Pay.

46

EXHIBIT 1 PAGE 47

If Respondents want to object to the Order to Pay, Respondents must formally request a hearing in writing within 20 calendar days after service of this Notice of Assessment, as explained at 12 U.S.C. § 1818(i)(2)(H).  Respondents may object to the Order to Pay by requesting a hearing in a formal Answer, as specified in 12 C.F.R. § 308.19.  **If Respondents fail to request a hearing to object to the Order to Pay within 20 calendar days from the date of service of this Notice of Assessment, the penalties assessed against Respondents will be final and unappealable under 12 U.S.C. § 1818(i)(E)(ii) and 12 C.F.R. § 308.19(c)(2), and must be paid within 60 calendar days after the date of service of this Notice of Assessment**

## NOTICE OF HEARING

Each Respondent must file an Answer to object to the Notice of Charges within 20 days from the date of service under 12 C.F.R. § 308.19.  Each Respondent may file one document containing both the Answer to the Notice of Charges, and a request for hearing on the Orders, if applicable.  The hearing will be held before an Administrative Law Judge (ALJ) assigned by the Office of Financial Institution Adjudication (OFIA) under 5 U.S.C. § 3105.  The hearing on the Notice of Charges will begin on a date set by the ALJ in Providence, Rhode Island, or in another location set by the ALJ.  The hearing will be public and conducted in accordance with 12 U.S.C. §§ 1811-1831aa, the Administrative Procedure Act, 5 U.S.C. §§ 551-559, and 12 C.F.R. Part 308, subparts A and B.

An original and one copy of all papers filed in this proceeding must be served upon OFIA, 3501 N. Fairfax Drive, Suite VS-D8116, Arlington, VA 22226-3500, in the manner specified at 12 C.F.R. § 308.10.  Also, copies of all papers filed in this proceeding must be served upon the following: FDIC Administrative Officer, 550 17th Street, N.W., Washington, D.C. 20429; Seth P. Rosebrock, Assistant General Counsel, Enforcement Section, Legal Division, FDIC, 550 17th Street, N.W., Washington, D. C. 20429; and David A. Schecker, Regional Counsel, Boston Area Office, Federal Deposit Insurance Corporation, 15 Braintree Hill Office Park, Braintree, MA

EXHIBIT 1 PAGE 48

02184.  Respondents are encouraged to file any subsequent documents electronically with OFIA at ofia@fdic.gov.

## PRAYERS FOR RELIEF

The FDIC prays that an Order of Removal and Prohibition from Further Participation under 12 U.S.C. § 1818(e) and an Order to Pay in the amount of $400,000 and assessed under 12 U.S.C. § 1818(i)(2) be issued against Respondent Catanzaro.

The FDIC prays that an Order of Prohibition from Further Participation under 12 U.S.C. § 1818(e) and an Order to Pay in the amount of $128,000 and assessed under 12 U.S.C. § 1818(i)(2) be issued against Respondent Desrosiers.

The FDIC prays that an Order of Prohibition from Further Participation under 12 U.S.C. § 1818(e), an Order to Pay in the amount of $74,000 and assessed under 12 U.S.C. § 1818(i)(2), and an Order for Restitution in the amount of at least $326,000 and assessed under 12 U.S.C. § 1818(b)(6) be issued against Respondent Ponte.

EXHIBIT 1 PAGE 49

Issued under delegated authority.

Dated February 10, 2023.

PATRICIA
COLOHAN

Digitally signed by
PATRICIA COLOHAN
Date: 2023.02.10 08:22:05
-05'00'

Patricia A. Colohan
Associate Director
Division of Risk Management Supervision

49

EXHIBIT 1 PAGE 50